IN THE UNITED STATES DISTRICT COURT
FOR MONTANA

IN THE MATTER OF THE SEARCH
OF INFORMATION ASSOCIATED
WITH:

(406) 217-7520 TRACFONE, KNOWN
TO BE ASSOCIATED WITH CARI
ANN MARTIN

THAT IS STORED AT PREMISES
CONROLLED BY VERIZON
WIRELESS

Case No.    17-10-GF-JTJ

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Tavia C. Hulme, being first duly sworn, hereby depose and state as
follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant
for information associated with certain accounts that are stored at premises owned,
maintained, controlled, or operated by Verizon Wireless, a wireless provider
headquartered in Bedminster, New Jersey.  The information to be searched is
described in the following paragraphs and in Attachment A.  This affidavit is made
in support of an application for a search warrant under 18 U.S.C. §§ 2703(a),
2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon Wireless to disclose to the

government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations (HSI), and have been since September 2001. In addition to my experience as an HSI Special Agent, I received a Bachelor of Arts degree from the University of Great Falls in May 2001. I am presently assigned to the Russell Country Drug Task Force in Great Falls, Montana, and have been so assigned for approximately two years. I have been involved in a number of investigations involving narcotics and have received training in this area. I have participated in numerous seizures of methamphetamine and subsequent arrests. I have also spoken with and have been advised by other agents regarding narcotics investigations and their investigative techniques.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C §§ 841 and

2

846 have been committed by Cari Ann MARTIN. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## **PROBABLE CAUSE**

5. On December 30, 2015, the Russell Country Drug Task Force (RCDTF) initiated an investigation into the drug trafficking and distribution activities of Robert David LINN, Jr. following a probation search of the residence of Myron BROWN located at 1607 7th Avenue Northeast, Great Falls, Montana. BROWN admitted that during the previous two months he had distributed ounce quantities of methamphetamine on a weekly basis for LINN. BROWN further stated that LINN had four individuals distributing narcotics under LINN's direction.

6. Subsequent interviews of cooperating defendants and confidential informants identified the four main individuals distributing the narcotics for LINN as Ronald BROMLIE, David Alan NELSON, Jesse LEWIS, and Myron BROWN. A criminal history search of Robert David LINN, Jr. revealed he had two previous federal narcotics related convictions.

7. Between October 19, 2016, and January 12, 2017, HSI and the RCDTF, utilizing a HSI Undercover Agent (UCA), conducted five controlled

3

purchases of methamphetamine from Cari Ann MARTIN, a known member of the LINN organization, and also a known distributor of narcotics for LINN. Arrangements made between the UCA and MARTIN to facilitate the controlled purchases of narcotics were made through text messages and voice telephone calls to (406) 217-7520, the phone number associated with MARTIN. Based on telephone tolls, text messages recovered pursuant to a search warrant, and physical surveillance, agents believe LINN supplied MARTIN with the methamphetamine for these controlled purchases.

8.     On January 12, 2017, the HSI UCA arranged the controlled purchase of methamphetamine with MARTIN by contacting telephone number (406) 217-7520 via telephone call voice conversations and text messages. At approximately 1205 hours, the UCA drove to MARTIN's residence at 725 2nd Avenue South, Great Falls, Montana, and called MARTIN to let her know the UCA had arrived at her residence. MARTIN then came down to the UCA vehicle.

9.     MARTIN explained to the UCA that she takes care of a few different people by helping them bond out of jail, and she also explained how she takes care of day to day problems for these people. Martin further explained that she has to take care of "Bob," who she said is "my big guy" and she does everything for him. MARTIN said they were still dealing and explained that she thought they were shutting down, but her supplier (referring to "Bob"), just wanted her to stop selling

4

smaller quantities. MARTIN said bigger quantities, like what she was selling to the UCA, were preferable because less people come around. MARTIN provided the UCA with two baggies that appeared to contain approximately two ounces of methamphetamine. Based on the conversation between the UCA and MARTIN, agents believe MARTIN received this methamphetamine from LINN. The methamphetamine weighed 53.26 grams and showed a presumptive positive test for methamphetamine.

10.    Agents analyzed the toll records of MARTIN'S telephone number (406) 217-7520, compared with the toll records provided by AT&T Mobility for telephone number (406) 403-3383, which is a phone number known to be associated with LINN. The AT&T Mobility records listed 22 incoming and outgoing SMS messages from (406) 403-3383 to telephone number (406) 217-7520, for the time period of February 5, 2017, to March 5, 2017. Additionally, analysis indicated three voice telephone calls between MARTIN's phone number of (406) 217-7520 and (406) 403-3383 for the same time period.

11.    On February 22, 2017, after months of investigation, HSI applied for and obtained an Order Authorizing the Interception of Wire and Electronic Communications for telephone number (406) 403-3383, which is associated with Robert David LINN, Jr. This order was signed by United States District Judge Brian Morris in the United States District Court for the District of Montana.

5

12.     On February 27, 2017, the Title III Wire Intercept for (406) 403-3383, known to be utilized by Robert David LINN, Jr., was activated.

13.     During the Title III investigation, a second cellular telephone number of (406) 861-5088 was identified as associated with Robert David LINN, Jr.  On February 28, 2017, a Controlled Substance Subpoena was issued to AT&T Mobility, LLC, for records associated with telephone number (406) 861-5088, believed to be utilized by LINN.  Records received from AT&T indicate that the telephone is a pre-paid AT&T Go Phone, for which no subscriber details are required for phone activation.  Records also show this telephone number was activated on January 22, 2017.

14.     Analysis of toll records provided by AT&T Mobility for telephone number (406) 861-5088 listed 143 incoming and outgoing SMS messages with telephone number (406) 217-7520, associated with MARTIN, for the time period of January 27, 2017, to February 23, 2017.   Additionally, analysis indicated 173 voice telephone calls between MARTIN and (406) 861-5088 for the time period between January 27, 2017, to March 1, 2017.

15.     On March 1, 2017, the previously mentioned HSI UCA again contacted MARTIN on her telephone number (406) 217-7520, via SMS messages and voice telephone calls, in order to arrange a controlled purchase of four ounces of methamphetamine.  On March 1, 2017, at approximately 1621 hours, the UCA

6

sent an outgoing SMS message to MARTIN at (406) 217-7520 that stated, "Hey what's up," with a follow up outgoing SMS message at 1632 hours that stated, "Can you help me out?"

16. On March 1, 2017, at approximately 1636 hours, agents intercepted an incoming call (reference call #157) on the Target Telephone (406) 403-3383 from (406) 217-7520, associated with MARTIN. MARTIN said she was "ready," to which LINN responded that he would be "leaving soon." RCDTF surveillance units responded to the area around MARTIN's apartment building, Cloud 9 Apartments located at 725 2nd Avenue South, Great Falls, Montana, in order to look for MARTIN.

17. An analysis of records obtained from AT&T Mobility for telephone number (406) 861-5088 listed an outgoing voice telephone call, at approximately 1710 hours, to telephone number (406) 217-7520, associated with MARTIN. At approximately 1715 hours, RCDTF surveillance observed MARTIN open the door to her residence to look around the area. Additional telephone toll analysis for (406) 861-5088 listed an outgoing call at 1718 hours to MARTIN at telephone number (406) 217-7520. Surveillance units observed LINN arrive near the residence of MARTIN in a white Dodge truck at approximately the same time. At

7

1720 hours, MARTIN exited her residence and walked to the passenger side of the vehicle that LINN was driving.

18.     At approximately 1722 hours, while MARTIN sat with LINN in his parked truck, the UCA received an incoming SMS messages from MARTIN.  This message stated, "What do you need."  One minute later, the UCA sent an outgoing SMS message to MARTIN that stated, "The norm. My guy is playing games. Should have known better."  The following minute, MARTIN replied with an SMS message to the UCA that stated, "ok when."  Subsequently at 1725 hours, the UCA sent an outgoing SMS message to MARTIN that read, "Early next week?" MARTIN sent an outgoing SMS message to the UCA at approximately 1725 hours that read, "You got it." At approximately 1725 hours, surveillance units observed MARTIN walk back to her apartment.

19.     Through training, personal observation and information obtained from other agents, it is known that narcotics dealers utilize their cellular telephones to assist in conducting narcotics transactions.  Furthermore, narcotics dealers use their telephone to remain in contact with their source of supply as well as persons purchasing narcotics, via voice telephone calls, and SMS messages

20.     In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public, and that

8

stored electronic communications, including retrieved and unretrieved voicemail,

text, and multimedia messages for Verizon Wireless subscribers may be located on

the computers of Verizon Wireless.  Further, I am aware that computers located at

Verizon Wirelss contain information and other stored electronic communications

belonging to unrelated third parties.

21.     Wireless phone providers often provide their subscribers with

voicemail services.  In general, a provider will store voicemail messages on behalf

of a particular subscriber until the subscriber deletes the voicemail.  If the

subscriber does not delete the message, the message may remain in the system of

Verizon Wireless for weeks or months.

22.     Among the services commonly offered by wireless phone providers is

the capacity to send short text or multimedia messages (photos, audio, or video)

from one subscriber's phone or wireless device to another phone or wireless device

via one or more wireless providers.  This service is often referred to as "Short

Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is

often referred to generically as "text messaging." Based on my knowledge and

experience, I believe that stored electronic communications, including SMS and

MMS messages that have been sent or received by subscribers, may be stored by

Verizon Wireless for short periods incident to and following their transmission.  In

9

addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

23.    Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.  This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages.  Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

24.    Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received.  The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the

embedded unique identifiers for a cellular device could take several different

forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic

Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a

Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier

("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a

cellular device connects to a cellular antenna or tower, it reveals its embedded

unique identifiers to the cellular antenna or tower in order to obtain service, and the

cellular antenna or tower records those identifiers as a matter of course.

     25.     Many wireless providers retain information about the location in

which a particular communication was transmitted or received. This information

can include data about which "cell towers" (i.e., antenna towers covering specific

geographic areas) received a radio signal from the cellular device and thereby

transmitted or received the communication in question.

     26.     Wireless providers also maintain business records and subscriber

information for particular accounts. This information could include the

subscribers' full names and addresses, the address to which any equipment was

shipped, the date on which the account was opened, the length of service, the types

of service utilized, the ESN or other unique identifier for the cellular device

associated with the account, the subscribers' Social Security Numbers and dates of

11

birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

27.    In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

28.    As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider

can indicate who has used or controlled the cellular device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time. Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular device owner. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of

guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

29.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

30.     Based on the forgoing, I request that the Court issue the proposed search warrant.

31.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the

United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

32.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

33.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Tavia C. Hulme
Special Agent
Homeland Security Investigations

15

Subscribed and sworn to before me on ___March   7___, 2017.

HONORABLE JOHN T. JOHNSTON
UNITED STATES MAGISTRATE JUDGE